## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MCINTYRE GROUP, LTD.,<br>24601 Governors Highway,<br>University Park, IL 60466,<br>on behalf of itself and all others similarly<br>situated,<br><br>               Plaintiff,<br><br>          v.<br><br>ASSOCIATION OF AMERICAN<br>RAILROADS, BNSF RAILWAY<br>COMPANY, CSX TRANSPORTATION,<br>INC., KANSAS CITY SOUTHERN<br>RAILWAY COMPANY, NORFOLK<br>SOUTHERN RAILWAY COMPANY, AND<br>UNION PACIFIC RAILROAD<br>COMPANY,<br><br>               Defendants. | Civil Action No. _____<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff McIntyre Group, Ltd. ("McIntyre" or "Plaintiff"), individually and on behalf of

a class of all those similarly situated, brings this action for damages under the antitrust laws of

the United States against Defendants Association of American Railroads, BNSF Railway

Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern

Railway Company, and Union Pacific Railroad Company, alleging as follows:

### DEFINITIONS

1.    "Class I Railroads" are line haul freight railroads with 2005 operating revenue in

excess of $319.3 million. There are currently seven Class I railroads operating in the United

States: (1) BNSF Railway Company, (2) CSX Transportation, Inc., (3) Grand Trunk

Corporation, (4) Kansas City Southern Railway Company, (5) Norfolk Southern Railway

Company, (6) Soo Line Railroad Company, and (7) Union Pacific Railroad Company. The Soo Line Railroad is owned by Canadian Pacific Railway. The Grand Trunk Corporation is owned by the Canadian National Railway.

2.      "Defendants" refers to all six named Defendants in this action, while "Railroad Defendants" refers to the five railroad company Defendants (BNSF, CXS, Kansas City Southern, Norfolk Southern, and Union Pacific).

3.      "Rail Fuel Surcharge" or "Surcharge" is a separate fee charged to shippers by the Railroad Defendants for agreed-upon freight transportation, ostensibly to compensate for unforeseen increases in the cost of fuel.

4.      "Unregulated freight" means rail freight transportation services where the rates are set by private contracts or through other means exempt from rate regulation under federal law.

## NATURE OF THE ACTION

5.      This is an antitrust class action alleging that Defendants conspired to fix, raise, maintain, or stabilize prices of unregulated rail freight transportation services sold in the United States by imposing agreed upon "Rail Fuel Surcharges" (as defined above) on rail freight shipments from July 1, 2003 to the present (the "Class Period"), in violation of Section 1 of the Sherman Antitrust Act.

6.      Plaintiff alleges that Defendants computed the Rail Fuel Surcharges as a percentage of the customers' base freight rate, rather than actual fuel consumption, and agreed upon the use of common indices and trigger points for adjusting the percentages monthly. Defendants published Rail Fuel Surcharges on the Internet to facilitate coordination and the detection of any deviation from collusive pricing. Defendants maintained uniformity of Rail

Fuel Surcharges throughout the Class Period by agreeing to compute the surcharges as a percentage of the rail freight transport base rate and by agreeing upon common indices, timing, and trigger points for adjusting the percentages.

7.    Although the purported purpose of a Rail Fuel Surcharge is to allow recovery by a railroad of an unanticipated fuel cost increase, Defendants, by working in concert, were able to use Rail Fuel Surcharges as revenue generators and profit centers.

8.    The Railroad Defendants would not have naturally implemented and adjusted the Rail Fuel Surcharges independently.  By working in concert, Defendants were able to set and maintain Rail Fuel Surcharges at inflated levels.

9.    During the Class Period, railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Railroad Defendants.  For example, after concluding in 2003 that Rail Fuel Surcharges charged by the Railroad Defendants were "not supported" by fuel cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition."

10.    As a result of this price-fixing conspiracy, Defendants restrained competition for unregulated rail freight transportation services and caused injury to the business and property of Plaintiff and members of the proposed Class.  Plaintiff and the Class members paid higher prices for unregulated rail freight transportation than would have been the case in the absence of Defendants' unlawful activities alleged herein.

11.    Plaintiff seeks damages on behalf of itself and the proposed Class for Rail Fuel Surcharges imposed on rail freight shipments made pursuant to private transportation contracts

and through other means exempt from rate regulation under federal law. Plaintiff does not seek, on behalf of itself or the Class, damages or relief arising from any fuel surcharges imposed on rate-regulated freight transportation.

## JURISDICTION AND VENUE

12.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

13.    Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

14.    Venue is proper in this district pursuant 28 U.S.C. § 1391(b) and (c) and by Section 12 of the Clayton Act, 15 U.S.C. § 22.

15.    Defendants maintain offices, have agents, or transact business within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District; and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

16.    This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

**PARTIES**

17.    Plaintiff McIntyre Group, Ltd. is a corporation organized under the laws of the State of Illinois, with its principal place of business at 24601 Governors Highway, University Park, IL  60466.  McIntyre is a leading manufacturer of high quality surfacants, polymers, chemical specialties, and cosmetic preservatives for the formulation of personal care, household, industrial, and institutional products

18.    McIntyre purchased unregulated rail freight transportation service directly from one or more of the Defendants during the Class Period and was assessed a Rail Fuel Surcharge.

19.    Defendant Association of American Railroads ("AAR") is a trade association located in Washington, D.C.  Among other things, AAR publishes key indexes used to compute unregulated rail freight charges, engages in lobbying on behalf of its members, gathers and maintains a variety of information relating to rail freight service, and issues publications.  AAR offers various tiers of membership, with "full membership" being available only to Class I railroads.  It is governed by a board of directors that includes the top executives of each Class I railroad in the United States.  According to AAR's Internet site: "Full membership offers the broadest array of AAR member benefits, including legislative and legal matters, safety, operations, research, and communications.  Benefits include all those provided to Associate Members, as well as additional information provided through AAR committees.  Full member assessments are set on a sliding scale based on the member's gross freight service revenues (or passenger revenues, in the case of passenger railroads). Full member railroads with gross freight revenues exceeding certain thresholds are eligible for a seat on AAR's Board of Directors."  The Railroad Defendants named in this action are all full members of the AAR and their chief executive officers are members of the AAR board of directors.

20.    Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation. BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad. BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

21.    Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces. CSX has railway lines throughout the eastern United States and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

22.    Defendant Kansas City Southern Railway Company ("KCSR") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105. KCSR owns and operates major freight railroad in ten states across the central and south central United States.

23.    Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510. NS is a major freight railroad operating primarily in the eastern United States. NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world. NS operates an intermodal terminal at 1000 S. Vandorn St., Washington, D.C. 20001 and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

24.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179. UP is the largest freight railroad in the United States. UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country. UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action on behalf of itself and all others similarly situated (the Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3). The Class is defined as follows:

> All purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and all governmental entities (the "Class").

26.    Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of the Defendants. Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable. Plaintiff further believes the member of the Class can be readily ascertained from Defendants' books and records.

27.    Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, on which Defendants imposed the artificially inflated Rail Fuel Surcharges.

Plaintiff and Class members sustained damages by paying inflated prices for the unregulated rail freight transportation as a result of Defendants' illegal conduct.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

29.     There are questions of law or fact common to the Class, including but not limited to the following:

       a.     Whether Defendants conspired, contracted, or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

       b.     Whether Defendants' conduct violated the federal antitrust laws; and

       c.     Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

30.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons

similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

## FACTUAL ALLEGATIONS

### The Heavily Regulated Railroad Industry Is Deregulated, Beginning In The Late 1970s

32.     In the 1970s, the freight railroad industry—then closely regulated by the federal government—was experiencing serious economic trouble with rising operating costs, financial losses, and corporate bankruptcies. In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980, which together largely deregulated the industry.

33.     As a result of this legislation, railroads and shippers could enter into private rail freight contracts. In contracts for rail freight transportation in markets where railroads faced effective competition or in contracts where rates were privately negotiated between the railroad and the shipper, the freight rates are unregulated by government agencies. Because shippers in some areas may not have competitive alternatives ("captive shippers"), Congress gave the Interstate Commerce Commission ("ICC") authority to establish a process under which captive shippers could obtain relief from unreasonably high rates. The ICC was later abolished by the Interstate Commerce Commission Termination Act of 1995, and its relevant rail freight regulatory functions were transferred to the Surface Transportation Board ("STB").

34.     The STB continues to regulate certain aspects of the freight railroad industry. Railroads, for example, have a common carrier obligation to provide rail service upon reasonable request. 49 U.S.C. 11101(a). They can provide that service under rates and terms agreed to in a confidential contract with the shipper, 49 U.S.C. 10709, or under openly available common carriage rates and service terms. 49 U.S.C. 11101. Rates and service terms established by

9

contract are generally not subject to STB regulation, except for limited protections against discrimination involving agricultural goods.    49 U.S.C. 10709(b), (c).

35.    This lawsuit deals only with rail freight not regulated by the STB, which comprises approximately 80 percent of the rail freight market.

### After Deregulation, The Rail Freight Industry Became Highly Concentrated

36.    The railroad freight industry became highly concentrated after Congress deregulated railroads.  In 1976, there were 63 Class I railroads operating in the United States.  By early 2000, the railroad industry had become so concentrated that further consolidation was unlikely if not impossible.  On March 17, 2000, the STB imposed a moratorium on any major railroad merger proposals.

37.    Currently, the five Railroad Defendants named in this action operate more than 90 percent of all domestic railroad track and are responsible for more than 90 percent of the total ton-miles of Class I rail freight shipped in the United States.

### The Railroads Abandoned Freight Contracts With Fuel-Cost-Escalation Provisions, Thereby Facilitating Their Conspiracy To Fix Rail Freight Transportation Prices Using Agreed Upon Rail Fuel Surcharges.

38.    As railroads contracted for freight transportation services, they increasingly required shippers to enter freight contracts with cost escalation provisions often tied to the "Rail Cost Adjustment Factor" ("RCAF").  The RCAF is published by Defendant AAR's Policy and Economics committee based in Washington, D.C., and includes fuel prices as a component of the cost escalation factor.  In the fourth quarter of 2002, the AAR—which is controlled by the major Class I railroads—published a RCAF without fuel as a component, which they called the "All Inclusive Index Less Fuel ("ALL-LF").  The ALL-LF facilitated Defendants' ability to assess separate Rail Fuel Surcharges and to coordinate that practice.

39.     Following publication of the ALL-LF, the Railroad Defendants instituted Rail Fuel Surcharges as a separate line item on bills submitted to shippers. When the price of oil rose in late 2003 and early 2004, Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues without having to renegotiate individual contracts. Of course, success was only possible if all the Railroad Defendants played along and did not undercut each other.

40.     In or about late March 2003, top executives of the five Railroad Defendants attended the Spring 2003 National Freight Transportation Association ("NFTA") meeting at the Greenbrier Resort in West Virginia, which is owned by Defendant CSX. According to its Internet site, the "object of the [NFTA] is to provide a forum for transportation executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry.

41.     NFTA meetings facilitate the development of personal relationships amongst the attendees. The Spring NFTA 2003 meeting allowed Defendants' top executives ample cover to meet and conspire at meals, on the golf course, and at other resort facilities. Thus, the meeting provided numerous opportunities for Defendants' top executives to discuss and agree upon the specifics of the Rail Fuel Surcharges that were then implemented in or around July 2003.

42.     The key element of Defendants' price-fixing conspiracy was an agreement by the Railroad Defendants to act in concert with one another in demanding Rail Fuel Surcharges from shippers and by agreeing to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate paid by customers.

43.     Such a revenue-based fuel surcharge bore no direct relationship to actual increases in fuel costs. According to the STB, the Railroad Defendants have essentially

11

conceded that the Surcharges are not a means of recovering increased fuel costs associated with the movement of freight, but are rather a "revenue enhancement measure" intended to achieve across-the-board increases in the prices charged by Defendants for rail freight transportation. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 at 7 (Jan. 25, 2007).

44.    The Railroad Defendants implemented and maintained their agreement by publicly announcing surcharge increases and posting the monthly fuel surcharge percentages on their Internet sites. This allowed them to monitor and enforce Rail Fuel Surcharge levels.

45.    As a result of Defendants' concerted action, prices of rail freight transportation services charged to Class members were raised to or maintained at supracompetitive levels throughout the Class Period.

46.    Further, AAR meetings and events provided cover for the Railroad Defendants to discuss, agree upon, and maintain a common course of action with respect to Rail Fuel Surcharge.

### Implementation Of The Rail Fuel Surcharge Agreement

47.    As early as June of 2003, BNSF and UP agreed to coordinate their Rail Fuel Surcharge prices. Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index while the BNSF carload fuel surcharge was based on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF"). In or about June of 2003, however, UP switched to the HDF Index pursuant to an agreement with the BNSF. From then on BNSF and UP moved in lockstep with each other both charging the exact same Rail Fuel Surcharge for each month of the Class Period.

48.    BNSF and UP agreed to administer the HDF index in precisely the same way. Whenever the U.S. average price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose 50 cents to $1.85 per gallon, BNSF and UP would apply a surcharge of 5 percent. The surcharge would increase/decrease 10 percent for every $1 dollar increase/decrease in the HDF Index and corresponding increments thereof.

49.    BNSF and UP also coordinated when they would change their fuel surcharge. They agreed that the Surcharge would be announced the first day of the month following a change in the Index and would become effective the month after that. So, for example, if the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

50.    Using the HDF index, BNSF and UP moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

51.    The Fuel Surcharge Percentages charged by BNSF and UP for carload shipments varied before the Class Period began, but were identical starting in July, 2003.

52.    The choice to use the HDF Index for fuel surcharges was arbitrary. Also arbitrary were the decisions to set the trigger point at $1.35 per gallon, announce the surcharges on the first day of the month following a change in the Index, and to apply the surcharge in the second calendar month after the change in the Index. It is not plausible to suggest that such conduct

13

stems from independent decision-making. Rather, the parallel conduct in conjunction with other factors evidences the existence of an agreement in violation of Section 1 of the Sherman Act. It defies reason to suggest that BNSF and UP, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would be announced, (6) the dates on which Surcharges would become effective, and (7) the amount of the Surcharges.

53.    In short, the fact that BNSF and UP both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their behavior. The similarities are both too precise and too comprehensive to have been arrived at independently.

54.    In February 2004 or earlier, Defendants CSX and NS agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*. Indeed, not only did these railroads agree to use the WTI index (as opposed to many other available indices); they too agreed to administer the index in precisely the same way.

55.    Specifically, after an initial period in which their selected WTI trigger price differed, CSX and NS agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel. So, for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel

14

Surcharge would be adjusted upward/downward by 2 percent for every $5 increase/decrease in the WTI average price.

56.    CSX and NS also coordinated when they would change their fuel surcharge—two calendar months after the WTI index had adjusted, thereby using the fuel surcharge price timing used by BNSF and UP.  For example, if the WTI average price exceeded $23 per barrel in January, the CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, CSX and NS could apply exactly the same fuel surcharge percentage month after month.  CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

57.    The net result is that there was uniformity among CSX and NS in the monthly surcharge percentages they charged customers for most of the Class Period.

58.    The Fuel Surcharge Percentages charged by CSX and NS for carload shipments varied before the Class Period, but were identical starting in February 2004, and they also were identical to those of KCSR starting in June of 2005, when KCSR joined the conspiracy.

59.    The choice to use the WTI index for fuel surcharges was arbitrary.  Also arbitrary was the decision to set the trigger point at $23 per barrel and to apply the surcharge in the second calendar month after the average price of WTI oil had changed.  Given Defendants' convergence on such arbitrary conclusions, Defendants' conduct cannot stem from independent decision. Rather, Defendants' conduct is evidence of an agreement in violation of § 1.  It defies logic that Defendants, facing myriad differences in economic factors and business demands and requirements, would independently make the same decisions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for

application of the Surcharges, (5) the dates on which Surcharges would become effective, and (6) the amount of the Surcharges.

60.    In short, the fact that CSX and NS both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their behavior. The similarities are too precise and too comprehensive to have been arrived at independently.

61.    The Railroad Defendants operate geographically dispersed, multibillion dollar corporations with thousands of locomotives, and other pieces of heavy railroad equipment, and have massive fuel requirements. The Railroad Defendants acquire fuel at different prices at different times to meet their various business requirements. The specific minutiae of Defendants' parallel behavior as described herein could not have resulted from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advanced understanding among the parties.

62.    The Railroad Defendants' use of the Rail Fuel Surcharges was not routine free market conduct. In addition to the practical impossibility that each Railroad Defendant would make so many of the very same Rail Fuel Surcharge business decisions, such a convergence would simply not occur in an free market. In a truly competitive market, the levying of surcharges by one or a few railroads based on a percentage of a customer's base rate—bearing no relation to the actual costs of fuel consumed—should create competition on surcharges by other railroads seeking to gain business. Here, the Railroad Defendants did not compete and the only plausible explanation for that lack of competition is that the Railroad Defendants had entered into an unlawful agreement.

**Defendants Used Surcharges To Fix Rail Freight Prices
And Increase Profits, Not To Recover Costs**

63.    Defendants, from the beginning of the Class Period and before, fixed the price of the Rail Fuel Surcharges in order to artificially increase the prices of rail freight transportation services. The surcharges were not a cost recovery mechanism, they were a revenue generating profit center. By computing the Rail Fuel Surcharge as a percentage of the base rate charged to the shipper, the Railroad Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge was applied.

64.    By using the price-fixed Rail Fuel Surcharges to set prices for rail freight transportation services, the Railroad Defendants realized billions of dollars in extra revenues during the Class Period from Plaintiff and members of the proposed Class.

**The STB Ruled That Defendants' Surcharges Constitute An "Unreasonable Practice"**

65.    In January 2007, the STB served an administrative decision concluding that the railroads' practice of computing Rail Fuel Surcharges as a percentage of base rates for regulated rail freight transport was "a misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to which they are applied. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 (Jan. 25, 2007). The STB directed railroads to stop this unreasonable practice. *Id.*

66.    Although the STB's decision applied only to regulated freight, the Railroad Defendants followed the same unreasonable practices with regard to the unregulated freight that is the subject of this complaint.

67.     The STB has also issued a Notice of Proposed Rulemaking in which it has proposed rules to monitor the freight railroads' monthly fuel costs, consumption, and revenue from Rail Fuel Surcharges.

## ANTITRUST "PLUS FACTORS"

68.     Antitrust "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges.  The rail transportation industry is marked by certain structural and other characteristics that make a price-fixing cartel feasible:

    a.     The railroad industry is highly concentrated.  The Railroad Defendants in this case are the five largest remaining domestic Class I railroads following decades of mergers and consolidation.  The Railroad Defendants account for more than 90 percent of the nation's rail freight traffic.  Such high concentration facilitates the possibility of a price-fixing cartel.

    b.     There are significant barriers to entry into the railroad industry.  To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities.  Such infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers.  Entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

    c.     The Rail Fuel Surcharges were highly standardized.  The Railroad Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then

published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications. It is well recognized that markets having uniform and homogeneous products or services are susceptible to price fixing.

      d.    The railroad industry has a history of price fixing and other anti-competitive behavior. In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt. Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate-making committees." Although these bodies disappeared from public view after deregulation, the railroad industry has continued to engage in market manipulation, unreasonable rate practices, and other discriminatory practices against a wide spectrum of freight customers.

      e.    The CEOs of the Railroad Defendants are all board members of the AAR, which facilitates transfer of pricing information. The AAR describes itself as "the central coordinating and research agency of the North American rail industry." Full membership, however, is available only to Class I railroads operating in the United States, five of which are Defendants in this action. The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

      f.    Defendants acted in contravention of their individual economic interests. The Railroad Defendants did not behave as if they were in a competitive market:

      i)    Defendants failed to compete on the Surcharges. In a truly competitive market, rational railroads levying surcharges based on a percentage of a customer's freight rate—bearing no relation to the actual costs of fuel consumed and therefore not

19

actually crucial to cost recovery—would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Railroad Defendants that the Rail Fuel Surcharges were "not negotiable." Several national shipper organizations met with each of the Railroad Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where the BNSF is the only carrier. The other Railroad Defendants refused to address the concerns of their customers.

      ii)    <u>Defendants' behavior alienated customers</u>. At or about the time Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly or monthly. Previously, the Railroad Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel surcharges altogether. The Railroad Defendants made this switch even though most shippers preferred the former system in order to minimize risk. In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business. Here, all Railroad Defendants raised prices and did not offer any compensation to customers for assuming additional risk. This behavior gives rise to an inference of price fixing.

iii)    <u>Defendants changed billing practices to expose each other's prices</u>. The Railroad Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped. Instead, the Railroad Defendants moved to what is known in the industry as "Rule 11 pricing." Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment. The Railroad Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

g.    <u>During the Class Period, rail freight demand grew, but each Defendant's market share remained stable</u>. Finally, demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet the Railroad Defendants' market shares remained relatively stable and constant. The fact that market shares did not did not fluctuate significantly during a period of demand growth is further indication that the Railroad Defendants agreed to price fix rather than to compete for new sales.

## INTERSTATE TRADE AND COMMERCE

69.    During the Class Period, the Railroad Defendants transported more than 90 percent of all rail freight shipments within the United States. According to the STB, railway operating revenues for all Class I freight railroads was more than $52 billion in 2006.

70.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period,

Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market rail freight transportation services.

71.     The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

72.     The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a.     The prices paid by Plaintiff and the Class for unregulated rail freight transportation services were fixed or stabilized at supracompetitive levels;

b.     The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation were been fixed or stabilized at supracompetitive levels;

c.     Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

d.     Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed and eliminated.

73.     By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by the plaintiff and the Class is the payment of supracompetitive prices for unregulated rail freight transportation as a result of Defendants' illegal contract,

22

combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)

74.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

75.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

76.    The contract, combination, or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

77.    Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

78.    The contract, combination or conspiracy has had the following effects:

a.    Prices charged to Plaintiff and the Class for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

b.       Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied

to unregulated rail freight transportation were fixed and/or maintained at

supracompetitive levels;

c.       Plaintiff and the Class have been deprived of the benefits of free, open and

unrestricted competition in the market for rail freight transportation services; and

d.       Competition in establishing the prices paid, customers of, and territories

for rail freight transportation services has been unlawfully restrained, suppressed and

eliminated.

79.     As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class

have suffered injury in that they have paid supracompetitive prices for unregulated rail freight

transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

A.      That the Court determine that this action may be maintained as a class action
        under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that
        Plaintiff be denominated as class representative, and that Plaintiff's counsel be
        appointed as counsel for the Class;

B.      That the unlawful contract, combination, and conspiracy alleged in Count I be
        adjudged and decreed to be an unreasonable restraint of trade or commerce in
        violation of Section 1 of the Sherman Act;

C.      That Plaintiff and the Class recover compensatory damages, as provided by law,
        determined to have been sustained as to each of them, and that judgment be
        entered against Defendants on behalf of Plaintiff and each and every member of
        the Class;

D.      That each of the Defendants' respective officers, directors, agents, and employees,
        and all other persons acting on behalf of or in concert with them, be permanently
        enjoined and restrained from, directly or indirectly, continuing or maintaining the
        combination, conspiracy, or agreement alleged in this case;

E.      That Plaintiff and the Class recover treble damages, as provided by law;

F.      That Plaintiff and the Class recover their costs of the suit, including attorney's
        fees, as provided by law; and

G.    For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury

trial as to all issues triable by a jury.

Dated:  June 19, 2007         By:    *Benjamin D. Brown*
_____
Michael D. Hausfeld (D.C. Bar #153742)
Benjamin D. Brown (D.C. Bar #495836)
**COHEN MILSTEIN HAUSFELD & TOLL, P.L.L.C.**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Phone:  (202) 408-4600
Fax:  (202) 408-4699
Email: mhausfeld@cmht.com, bbrown@cmht.com

Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak, Jr. (D.D.C. Bar #475609)
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Phone:  (224) 632-4500
Fax:  (224) 632-4521
Email:  skanner@fklmlaw.com, dmillen@fklmlaw.com
        rwozniak@fklmlaw.com

Mark S. Goldman
**GOLDMAN, SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA  19428
Phone:  (484) 342-0700
Fax:  (484) 342-0701
Email:  Goldman@gsk-law.com

Andrew B. Sacks
**SACKS & WESTON**
114 Old York Road
Jenkintown, PA  19046
Phone:  (215) 925-8200
Fax:  (215) 925-0508
Email:  ABS@sackslaw.com

25

James Shedden
Lawrence W. Schad
**SCHAD, DIAMOND & SHEDDEN, P.C.**
332 S. Michigan Avenue
Suite 1000
Chicago, Illinois 60604-4398
Phone: (312) 939-6280
Fax: (312) 939-4661
Email: jshedden@lawsds.com
         lschad@lawsds.com

***Attorneys for Plaintiff McIntyre Group, Ltd. and the
Proposed Class***

A - 1101
09 -
CMC

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

McINTYRE GROUP, LTD.
24601 Governors Highway
University Park, IL  60466

88888

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Will County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Benjamin D. Brown
Cohen Milstein Hausfeld & Toll, PLLC
1100 New York Avenue, NW, Suite 500 West
Washington, DC  20005
(202) 408-4600

## DEFENDANTS

Association of American Railroads, et al.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

Case: 1:07-cv-01101
Assigned To : Collyer, Rosemary M.
Assign. Date : 6/19/2007
Description: Antitrust

JURY ACTION

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

◉ **A. Antitrust**

☒ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

6

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Sherman Act, Section 1, Price Fixing

**VII. REQUESTED IN COMPLAINT** [X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23  **DEMAND $**_____  Check YES only if demanded in complaint  **JURY DEMAND:** YES [X] NO □

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES [X] NO □  If yes, please complete related case form.

DATE June 19, 2007   SIGNATURE OF ATTORNEY OF RECORD _____

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.