## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **McINTYRE GROUP, LTD.,**<br>**24601 Governors Highway,**<br>**University Park, IL 60466,**<br>**on behalf of itself and all others similarly**<br>**situated,**<br><br>          **Plaintiff,**<br><br>       **v.**<br><br>**ASSOCIATION OF AMERICAN**<br>**RAILROADS, BNSF RAILWAY**<br>**COMPANY, CSX TRANSPORTATION,**<br>**INC., KANSAS CITY SOUTHERN**<br>**RAILWAY COMPANY, NORFOLK**<br>**SOUTHERN RAILWAY COMPANY, AND**<br>**UNION PACIFIC RAILROAD**<br>**COMPANY,**<br><br>          **Defendants.** | **Civil Action No. 07-cv-01101 (PLF)**<br><br><br><br><br>**AMENDED CLASS ACTION**<br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff McIntyre Group, Ltd. ("McIntyre" or "Plaintiff"), individually and on behalf of

a class of all those similarly situated, brings this action for damages under the antitrust laws of

the United States against Defendants Association of American Railroads, BNSF Railway

Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern

Railway Company, and Union Pacific Railroad Company.

Plaintiff, by and through undersigned counsel, complains and alleges as follows upon

information and belief except as to paragraphs applicable to Plaintiff individually, which are

based upon personal knowledge:

**NATURE OF THE ACTION**

1.     This antitrust class action charges that Defendants – the nation's Class I railroads and the trade association they control – have engaged in price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  "Class I Railroads" are line haul freight railroads with 2005 operating revenue in excess of $319.3 million.

2.     Plaintiff brings this action on behalf of itself and a class of entities who purchased unregulated rail freight shipping services from Defendants from July 1, 2003 to the present (the "Class Period") and who were assessed a so-called "fuel surcharge" for the shipping services (hereafter, "Rail Fuel Surcharge").

3.     Defendants conspired and combined to fix the prices of Rail Fuel Surcharges added to customers' bills during the Class Period.

4.     Defendants used rising fuel costs as cover for their collusive efforts to boost revenues through fuel surcharge programs shielded from normal competitive forces.  Defendants portrayed their Rail Fuel Surcharges as necessary to recoup unexpected fuel cost increases.  However, pursuant to their agreement, Defendants employed Rail Fuel Surcharges as revenue generators and profit centers.

5.     Defendants jointly implemented their conspiracy by working through the Defendant Association of American Railroads ("AAR"), a trade association that Defendant Railroads control.  The AAR had for years published an inflation index known as the Rail Cost Adjustment Factor ("RCAF"), which was used to modify shipping rates for regulated and unregulated freight shipments.  The RCAF relied upon a cost index known as the All-Inclusive Index ("AII"), which closely tracked seven input costs to the railroads, including fuel.  These

seven inputs were weighted according to their respective contribution to total cost.  The RCAF, therefore, provided a mechanism by which Defendant Railroads could increase their rates based on actual increases in the price of fuel.

6.      Defendants' customers were accustomed to the RCAF, which was generally considered an accurate cost-inflation index.  The Defendant Railroads, however, determined that they could achieve not merely cost recovery, but significant revenue gains, by collectively moving from solely adjusting rates by the RCAF to adding a separate fuel surcharge calculated as a percentage of the total rates charged to shippers.

7.      In 2003, Defendants worked together through the AAR to create and publish a new index – the All Inclusive Index Less Fuel ("AII-LF") – which *removed* fuel as a cost component from the RCAF.  After jointly "de-coupling" fuel from the RCAF, Defendants then coordinated their fuel surcharge programs, brought them into lockstep, and began to impose them on customers as contracts expired and were renewed.

8.      The Defendant Railroads published their Rail Fuel Surcharges on the Internet to facilitate coordination and maintenance of collusive pricing.  Defendants continued to do so even after the Antitrust Division of the Department of Justice raised concerns about the public disclosure of rates in their industry.

9.      Prior to the beginning of the conspiracy, Defendants' rail freight operating income had been essentially flat for several years.  Following implementation of the conspiracy in 2003, Defendants' revenues rose sharply and continued to rise throughout the Class Period.

10.     Railroad industry analysts took note of the curious "convergence" in Rail Fuel Surcharge methodologies adopted by the Railroad Defendants.  For example, after concluding in 2003 that Rail Fuel Surcharges charged by the Railroad Defendants were "not supported" by fuel

cost increases, one analyst stated that she was "puzzled by the fact that the railroads appear to be matching fuel surcharges rather than developing their own pricing initiatives." The analyst noted further that "the way to gain significant market share is to lead the competition rather than following the competition."

11.    As a result of their price-fixing conspiracy, Defendants restrained competition for unregulated rail freight transportation services and caused injury to the business and property of Plaintiff and members of the proposed Class. Plaintiff and the Class paid higher prices for Rail Fuel Surcharges and unregulated rail freight transportation than would have been paid absent Defendants' unlawful activities.

12.    Plaintiff seeks damages on behalf of itself and the proposed Class for Rail Fuel Surcharges imposed on rail freight shipments made pursuant to private transportation contracts and through other means exempt from rate regulation under federal law.

## JURISDICTION AND VENUE

13.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.    Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15.    Venue is proper in this district pursuant 28 U.S.C. § 1391(b) and (c) and by Section 12 of the Clayton Act, 15 U.S.C. § 22.

16.    Defendants maintain offices, have agents, or transact business within this judicial District; a substantial part of the events giving rise to the claim for relief occurred in this District;

and Defendants regularly and continuously conduct business in interstate commerce that is carried out in part in this District.

17.     This Court has personal jurisdiction over Defendants because, *inter alia*, each Defendant: (a) transacted business in this District; (b) directly or indirectly sold and delivered rail transportation services in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## PARTIES

18.     Plaintiff McIntyre Group, Ltd. is a corporation organized under the laws of the State of Illinois, with its principal place of business at 24601 Governors Highway, University Park, IL 60466.  McIntyre is a leading manufacturer of high quality surficants, polymers, chemical specialties, and cosmetic preservatives for the formulation of personal care, household, industrial, and institutional products.

19.     McIntyre purchased unregulated rail freight transportation service directly from one or more of the Defendants during the Class Period and was assessed a Rail Fuel Surcharge.

20.     Defendant Association of American Railroads ("AAR") is a trade association located in Washington, D.C.  Among other things, AAR publishes indexes used to compute unregulated rail freight charges, engages in lobbying on behalf of its members, gathers and maintains a variety of information relating to rail freight service, and issues publications.  AAR offers various tiers of membership, with "full membership" being available to any Class I railroad.  It is governed by a board of directors that includes the top executives of each United States Class I railroad.  According to AAR's Internet site:  "Full membership offers the broadest

array of AAR member benefits, including legislative and legal matters, safety, operations, research, and communications.  Benefits include all those provided to Associate Members, as well as additional information provided through AAR committees.  Full member assessments are set on a sliding scale based on the member's gross freight service revenues (or passenger revenues, in the case of passenger railroads). Full member railroads with gross freight revenues exceeding certain thresholds are eligible for a seat on AAR's Board of Directors."  The Railroad Defendants named in this action are all full members of the AAR and their chief executive officers are members of the AAR board of directors.

21.     Defendant BNSF Railway Company ("BNSF") has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131.  BNSF is a wholly owned subsidiary of the Burlington Northern Santa Fe Corporation, the holding company formed by the September 22, 1995 merger of Burlington Northern and Santa Fe Corporation.  BNSF is the second largest railroad network in North America and operates 32,000 route miles of railroad.  BNSF has offices and rail lines throughout the western United States, extending into the Southeastern states and maintains a government affairs office at 500 New Jersey Ave., N.W., Suite 550, Washington, D.C. 20001.

22.     Defendant CSX Transportation, Inc. ("CSX") has its principal place of business at 500 Water St., Jacksonville, Florida 32202.  CSX is a major freight railroad operating primarily in the eastern United States and Canada.  CSX links commercial markets in 23 states, the District of Columbia, and certain Canadian provinces.  CSX has railway lines throughout the eastern United States and maintains a government relations office at 1331 Pennsylvania Ave., N.W., Suite 560, Washington, D.C. 20004.

23.    Defendant Kansas City Southern Railway Company ("KCSR") has its principal place of business at 427 W. 12th St., Kansas City, Missouri 64105.  KCSR owns and operates major freight railroad in ten states across the central and south central United States.

24.    Defendant Norfolk Southern Railway Company ("NS") has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS serves all major eastern ports and connects with rail partners in the West, linking customers to markets around the world.  NS operates an intermodal terminal at 1000 S. Vandorn St., Washington, D.C. 20001 and maintains a government relations office at 1500 K Street, N.W., #375, Washington, D.C. 20005.

25.    Defendant Union Pacific Railroad Company ("UP") has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is the largest freight railroad in the United States.  UP serves primarily the western two-thirds of the United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country.  UP maintains an office at 600 13th Street, N.W., #340, Washington, D.C. 20005.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action on behalf of itself and all others similarly situated (the Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).  The Class is defined as follows:

> All purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from at least as early as July 2003 to the present (the "Class Period").
> Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and all governmental entities.

27.     Plaintiff does not know the exact size of the Class, since such information is in the exclusive control of the Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class is so numerous and geographically dispersed throughout the United States as to render joinder of all Class members impracticable.  Plaintiff further believes that the members of the Class can be readily ascertained from Defendants' books and records.

28.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased unregulated rail freight transportation from Defendants, on which Defendants imposed the artificially inflated Rail Fuel Surcharges. Plaintiff and Class members sustained damages by paying inflated prices for the unregulated rail freight transportation as a result of Defendants' illegal conduct.

29.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and antitrust litigation.

30.     There are questions of law or fact common to the Class, including but not limited to the following:

a.     Whether Defendants conspired or combined with others for the purpose and with the effect of fixing the price of Rail Fuel Surcharges applied to unregulated rail freight transportation services purchased by the Class;

b.     Whether Defendants' conduct violated the federal antitrust laws; and

c.     Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

31.    These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members.

32.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

## FACTUAL ALLEGATIONS

### BACKGROUND

**The Once Heavily Regulated Railroad Industry Became Largely Deregulated**

33.    In the 1970s, the freight railroad industry – then closely regulated by the federal government – was experiencing serious economic trouble with rising operating costs, financial losses, and corporate bankruptcies.  In response, Congress passed the Railroad Revitalization and Regulatory Reform Act of 1976 and the Staggers Rail Act of 1980 (the "Staggers Act"), which together largely deregulated the industry.

34.    As a result of the Staggers Act, railroads and shippers could enter into private rail freight contracts.  In markets where railroads face effective competition and where rates and service terms are in privately negotiated rail transportation contracts between the railroad and the shipper, the freight rates are unregulated by government agencies.  Because shippers in some areas may not have competitive alternatives to a single railroad ("captive shippers"), Congress

gave the Interstate Commerce Commission ("ICC") authority to establish a process under which captive shippers could obtain relief from unreasonably high rates. The ICC was later abolished by the Interstate Commerce Commission Termination Act of 1995, and its relevant rail freight regulatory functions were transferred to the Surface Transportation Board ("STB").

35.    The STB continues to regulate certain aspects of the freight railroad industry. Railroads, for example, have a common carrier obligation to provide rail service upon reasonable request. 49 U.S.C. 11101(a). They can provide that service under rates and terms agreed to in a confidential contract with the shipper, 49 U.S.C. 10709, or under openly available common carriage rates and service terms. 49 U.S.C. 11101. Rates and service terms established by contract are generally not subject to STB regulation, except for limited protections against discrimination involving agricultural goods. 49 U.S.C. 10709(b), (c). The STB has also exempted certain categories of freight traffic from regulation.

36.    This lawsuit deals only with rail freight not regulated by the STB, which comprises approximately 80 percent of the rail freight market.

### After Deregulation, the Rail Freight Industry Became Concentrated; Collusion Became Feasible and Attractive

37.    The railroad freight industry became highly concentrated after deregulation. In 1976, there were 63 Class I railroads operating in the United States. By early 2000, the railroad industry had become so concentrated that further consolidation was unlikely if not impossible. On March 17, 2000, the STB imposed a moratorium on any major railroad merger proposals.

38.    By 2003, the five Railroad Defendants were the only remaining U.S.-based Class I railroads. This concentration made collusion on rates and/or fuel surcharges feasible.

39.    Currently, the five Railroad Defendants named in this action operate more than 90 percent of all domestic railroad track and are responsible for more than 90 percent of the total ton-miles of Class I rail freight shipped in the United States.

40.    In the AAR, which the Railroad Defendants control, the Railroad Defendants had a ready-made forum in which to collude.

41.    The Railroad Defendants also had an incentive to collude.  Because of a variety of factors – including mismanagement and inefficiencies associated with integrating acquired railroads – the Railroads Defendants had witnessed relatively flat or declining operating income in the several years prior to 2003.

**THE FUEL SURCHARGE CONSPIRACY**

**Defendants Implement the Conspiracy in 2003**

42.    In 2003, the Railroad Defendants worked together to implement fuel surcharge programs pursuant to which Rail Fuel Surcharges would serve as revenue generators.

**A.    The Railroads jointly remove fuel from their cost-adjustment index.**

43.    The Rail Cost Adjustment Factor ("RCAF") measures the rate of inflation in railroad inputs such as labor and fuel.  It was created for regulatory purposes and is overseen by the STB.  Defendant AAR calculates the RCAF, submits it to the STB for approval, and it is used in part to adjust regulated rate tariffs (which are not at issue in this case).

44.    For many years prior to 2003, the Railroad Defendants had also been using the RCAF in rate-adjustment provisions in unregulated contracts with customers (which are at issue in this case).  Railroads and shippers sometimes disagreed about such things as what percentage of the change in the RCAF to use in contracts and whether to include a productivity adjustment.

However, the RCAF was generally accepted by many of Defendants' customers and considered a reasonably reliable measure of changes in costs, including fuel costs.

45.    The price index that primarily underlies the RCAF is known as the All-Inclusive Index ("AII"). Seven component indices are weighted together to comprise the AII: Labor, Fuel, Materials & Supplies, Equipment Rents, Depreciation, Interest, and Other Expenses. Each component index, and the weights applied to each, are calculated based on freight operating expenses plus fixed charges, from data supplied to the STB by the Class I railroads in their annual reports.

46.    The fuel component index of the AII represents the change in the average price per gallon of No. 2 diesel fuel paid by the largest railroads. The price includes Federal excise taxes, transportation, and handling charges. The index, which is adjusted quarterly, reflects the original purchase price of fuel charged to railroad operating expenses during the middle month of the quarter.

47.    The fuel component index of the AII is, in short, a measure based on actual cost data from the Defendant Railroads designed to adjust rates to capture changes in fuel costs – exactly what Defendants claim their fuel surcharge programs are designed to do. Indeed, since 1984, the ICC (now the STB) has issued a standing invitation to the Defendant Railroads, and other parties, to petition for a change in the RCAF if they feel that it does not accurately reflect fuel prices.

48.    In 2003, Defendant Railroads decided that the use of the RCAF to adjust rates in unregulated shipping contracts was not allowing them to generate as much revenue as the Railroads could generate if they divorced Rail Fuel Surcharges from actual fuel cost and instead applied Rail Fuel Surcharges to the prices they charged for shipping freight.

49. Accordingly, in 2003, Defendants worked together through the AAR to create and publish an index without a fuel component that Defendants could use when negotiating new contracts. The creation and use of such an index was intended to allow Defendants to impose on their customers a Rail Fuel Surcharge applied to total revenue, without regard to actual fuel cost.

50. Defendant BNSF has acknowledged that it worked through the AAR (*i.e.*, with the other Railroad Defendants) to accomplish this revenue-generating measure in 2003. In a 4th Quarter 2003 earnings presentation, BNSF executives revealed that they had worked actively during the year with the AAR to publish an RCAF index without fuel. The executives stated that they had "looked hard" at the component of the RCAF covering fuel and "felt it was inadequate." They planned to look at their customers in the "next two to five years as contracts expire" in order to "de-couple" the fuel component from the cost-escalation provisions in the contracts, so they could replace them with a fuel-surcharge program tied to revenue.

51. In December of 2003, the AAR announced the "All-Inclusive Index Less Fuel" ("AII-LF"). As its name indicates, this index is merely the AII without the fuel component. It was the product of Defendants' collective action and a key to the effectiveness of their conspiracy.

52. Following publication of the AII-LF, the Railroad Defendants instituted Rail Fuel Surcharges as a separate line item in contracts and bills submitted to shippers. When the price of oil rose in late 2003 and early 2004, Defendants used monthly changes to their Rail Fuel Surcharges as an easy way to increase revenues.

53. In a July, 2004 earnings conference call, John Lanigan, BNSF's Chief Marketing Officer, was asked how BNSF planned to introduce revenue-based fuel surcharges into contracts with coal shippers, who were used to using the RCAF as a cost-adjustment provision. Lanigan

responded that BNSF would be able to do so because of changes made to the RCAF through the AAR. Referring to Matthew K. Rose, BNSF's Chairman, President, and CEO, Lanigan stated: "What happened last year, and Matt led the charge on there, is that there's a new index that [AAR] has that's basically an index without fuel. … So we'll do RCAF less fuel plus a direct fuel surcharge in the future."

54.     At about the same time, UP also was stating that it too was abandoning the fuel component of the RCAF in favor its direct surcharge program, noting that although the RCAF "looks at actual costs through the industry," the move to a fuel surcharge program was "a good model" that is "much more current and that's our direction where we want to go over time here."

55.     The creation and publication of an RCAF without a fuel component was not required by any regulatory body, nor was it necessary for any Railroad Defendant to institute independently its own individual fuel surcharge program. Instead, it was the product of joint action by Defendants to achieve their collective goal of generating additional profits through implementing revenue-based fuel surcharges.

**B.     Defendants' meetings outside the AAR**

56.     The AAR was not the only place at which Defendants were able to meet and coordinate their surcharge programs. Defendants' executives, many of whom have long personal and professional relationships, met during and just before the Class Period in forums conducive to reaching and maintaining agreement about their fuel surcharge programs.

57.     For example, in or about late March 2003, top executives of the five Railroad Defendants attended the Spring, 2003 National Freight Transportation Association ("NFTA") meeting at the Greenbrier Resort in West Virginia, which is owned by Defendant CSX. According to its Internet site, the "object of the [NFTA] is to provide a forum for transportation

executives of industrial firms and transportation companies to consider and discuss" various developments affecting the transportation industry.

58.    NFTA meetings facilitate the development of personal relationships among the attendees.  The NFTA Spring 2003 meeting allowed Defendants' top executives ample cover to meet and conspire at meals, on the golf course, and at other resort facilities.  The meeting provided numerous opportunities for Defendants to discuss and agree upon the coordination of their fuel surcharge programs that began in mid-2003.

59.    Defendants' coordination at such meetings and events is facilitated by the fact that, in the insular culture of the railroad industry, many of Defendants' executives have personal and professional connections that span decades.  Some of Defendants' executives entered the railroad business together.  For example, Richard K. Davidson (Chairman, President, and CEO of UP until January 31, 2007) and Michael Haverty (President and CEO of KCSR) began their careers in the same Missouri Pacific Management Training Program.  (Missouri Pacific was acquired by UP in 1982.)

60.    Matthew Rose of BNSF also later attended the Missouri Pacific Management Training Program.  Rose, who purportedly "led the charge" to have the AAR publish the AII-LF, has been referred to in the railroad trade press as a "leading proponent of industry pricing discipline."

**C.    Defendants coordinate their Rail Fuel Surcharge programs and bring them into lockstep.**

61.    At the same time Defendants were working together through the AAR to "de-couple" fuel from the standard cost-escalation indices used in the industry, and meeting at the NFTA and otherwise, Defendants began to bring their fuel surcharge programs into lockstep.

62.     The Railroad Defendants acted in concert in demanding Rail Fuel Surcharges from shippers and by agreeing to apply Rail Fuel Surcharges computed as a percentage of the base rail freight rate paid by customers.

63.     Such a revenue-based fuel surcharge bore no direct relationship to actual increases in fuel costs.  According to the STB, the Railroad Defendants have essentially conceded that the Surcharges are not a means of recovering increased fuel costs associated with the movement of freight, but are rather a "revenue enhancement measure" intended to achieve across-the-board increases in the prices charged by Defendants for rail freight transportation. *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex Parte No. 661 at 7 (Jan. 25, 2007).

64.     In June of 2003, BNSF and UP (the two railroads based in the western United States) began to coordinate their Rail Fuel Surcharge prices.  Prior to this time, the UP carload fuel surcharge was adjusted monthly based on the West Texas Intermediate ("WTI") Crude Oil Index, while the BNSF carload fuel surcharge was based on the U.S. Department of Energy (DOE) On-Highway Diesel Fuel Price Index ("HDF").  In or about June of 2003, however, UP switched to the HDF Index.  From then on BNSF and UP moved in lockstep with each other both charging the exact same Rail Fuel Surcharge for each month of the Class Period.

65.     UP's move to the same fuel price index used by BNSF in June of 2003 is striking evidence of concerted conduct in light of the fact that just *two months before*, UP had announced a different modification to its existing fuel surcharge program.  In April of 2003, UP made modifications to the trigger points it used for adjusting surcharges in its program, but did not change the index it employed.  The fact that, just two months later, UP switched indices and

began charging exactly the same surcharges as BNSF is evidence that this switch was the result of concerted conduct.

66.    BNSF and UP agreed to apply the HDF index to their fuel surcharge programs in precisely the same way. Whenever the U.S. average retail price of diesel fuel as measured by the HDF Index equaled or was lower than $1.35 per gallon, no surcharge was applied. When the HDF Index exceeded $1.35 per gallon, however, BNSF and UP both applied a surcharge of 0.5 percent for every five cent increase above $1.35 per gallon. So, for example, if the HDF Index rose 50 cents to $1.85 per gallon, BNSF and UP would apply a surcharge of 5 percent. The surcharge would increase/decrease 10 percent for every $1 dollar increase/decrease in the HDF Index and corresponding increments thereof.

67.    BNSF and UP also coordinated when they would change their fuel surcharges. They agreed that the surcharge would be announced the first day of the month following a change in the Index and would become effective the month after that. So, for example, if the HDF Index average price changed in January, BNSF and UP would announce their new Rail Fuel Surcharge percentage on February 1, and then apply the surcharge to shipments in March. BNSF and UP published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

68.    Using the HDF index, BNSF and UP moved in lockstep and charged virtually identical Rail Fuel Surcharges on a monthly basis throughout the Class Period.

69.    The Fuel Surcharge Percentages charged by BNSF and UP for carload shipments varied before the Class Period began, but were identical starting in July, 2003.

70.    It defies reason to suggest that BNSF and UP, facing myriad differences in economic factors and business demands and requirements, would independently arrive at the

same conclusions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would be announced, (6) the dates on which Surcharges would become effective, and (7) the amount of the Surcharges.

71.    In short, the fact that BNSF and UP both chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their behavior.  The similarities are both too precise and too comprehensive to have been arrived at independently.

72.    CSX announced its new "fuel cost recovery program" on March 20, 2003, which is about the same time it hosted the NFTA meeting attended by the Railroad Defendants.  As part of its new program, CSX began to apply its fuel surcharges in "smaller increments," adjusting them to the thirty-day average price of West Texas Intermediate ("WTI") crude oil.

73.    CSX and NS are based in the eastern United States.  Shortly after the AAR announced the new AII-LF, NS announced its "modified" surcharge program, which yielded the exact same surcharges as CSX's program.

74.    Defendants CSX and NS agreed to base their fuel surcharge programs on the average monthly price of West Texas Intermediate ("WTI") Crude Oil as published in the *Wall Street Journal*.  Indeed, not only did these railroads agree to use the WTI index (as opposed to many other available indices); they too agreed to administer the index in precisely the same way.

75.    Specifically, CSX and NS agreed to apply a fuel surcharge whenever the monthly average WTI price exceeded $23 per barrel. When that happened, Defendants' rates were increased 0.4 percent for every $1 dollar that the price of WTI oil exceeded $23 per barrel.  So,

for example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2 percent. The Rail Fuel Surcharge would be adjusted upward/downward by 2 percent for every $5 increase/decrease in the WTI average price.

76.     CSX and NS also coordinated when they would change their fuel surcharge – two calendar months after the WTI index had adjusted, thereby using the same fuel surcharge price timing used by BNSF and UP.  For example, if the WTI average price exceeded $23 per barrel in January, the CSX and NS would assess the applicable fuel surcharge percentage to all bills of lading dated in the month of March.  In this way, CSX and NS could apply exactly the same fuel surcharge percentage month after month.  CSX and NS published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

77.     The net result is that there was uniformity among CSX and NS in the monthly surcharge percentages they charged customers for almost all of the Class Period.

78.     The Fuel Surcharge Percentages charged by CSX and NS for shipments varied before the Class Period, but were identical starting in March of 2004, and they also were identical to those of KCSR starting in June of 2005, when KCSR joined the conspiracy.

79.     It defies logic that Defendants, facing myriad differences in economic factors and business demands and requirements, would independently make the same decisions regarding: (1) the use of Rail Fuel Surcharges, (2) use of the same fuel index, (3) calculating the Surcharges based on a percentage of the freight rate rather than actual fuel consumption, (4) use of the same trigger point for application of the Surcharges, (5) the dates on which Surcharges would become effective, and (6) the amount of the Surcharges.

80.     In short, the fact that CSX, NS, and KCSR chose and adhered to this same combination of features for their Rail Fuel Surcharge programs shows that they coordinated their

behavior.  The similarities are too precise and too comprehensive to have been arrived at independently.

81.    The Railroad Defendants operate geographically dispersed, multibillion dollar corporations with thousands of locomotives, and other pieces of heavy railroad equipment, and have massive fuel requirements.  The Railroad Defendants acquire fuel at different prices at different times to meet their various business requirements.  The specific minutiae of Defendants' parallel behavior as described herein could not have resulted from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advanced understanding among the parties.

**Defendants Used Surcharges to Fix Rail Freight Prices
and Increase Profits, Not to Recover Costs**

82.    The Railroad Defendants' use of the Rail Fuel Surcharges was not routine free market conduct.  In addition to the practical impossibility that each Railroad Defendant would make so many of the same Rail Fuel Surcharge business decisions independently, such a convergence would simply not occur in a free market.  In a competitive market, the levying of surcharges by one or a few railroads based on a percentage of a customer's base rate – bearing no relation to the actual costs of fuel consumed – should result in competitive moves by other railroads seeking to gain business.  Here, the Railroad Defendants did not compete, even in the presence of discontented customers, and the only plausible explanation for that lack of competition is that the Railroad Defendants had entered into an unlawful agreement.

83.    Defendants, from the beginning of the Class Period and before, fixed the price of the Rail Fuel Surcharges in order to increase artificially the prices of rail freight transportation services.  The surcharges were not a cost recovery mechanism, they were a revenue generating profit center.  By computing the Rail Fuel Surcharge as a percentage of the base rate charged to

the shipper, the Railroad Defendants ensured that there would be no real correlation between the rate increase and the increase in fuel costs for the particular shipment to which the surcharge was applied.

84.     The fuel indices used by the Railroad Defendants clearly overestimate the price Defendants paid for fuel.  The HDF and WTI are retail price indices, but railroads do not purchase fuel on the retail market.  Defendants purchase diesel fuel in bulk and pay wholesale prices.

85.     Defendants' use of retail price indices allowed them to over-recover their actual fuel costs.  For example, BNSF's average cost for diesel fuel in 3rd Quarter 2003 was $0.846 per gallon and its average cost of diesel fuel for 3rd Quarter 2004 was $0.988 per gallon.  Thus, BNSF's cost of fuel increased 14.4% from 3rd Quarter 2003 to 2004.  In contrast, the HDF 3rd Quarter 2003 price was $1.46 per gallon and $1.83 per gallon in 3rd Quarter 2004, amounting to a 25.3% increase.  Due to this disparity in increase percentages, shippers purchasing from BNSF paid 11% more than the actual price BNSF paid for fuel from 3rd Quarter 2003 to 2004.  Shippers of unregulated freight from the other Railroad Defendants similarly over-paid during this and other periods.

86.     Another reason why Defendants' Rail Fuel Surcharges were divorced from actual cost increases is that the surcharge levels disregarded gains in fuel efficiency.  As explained in a 2007 AAR publication, the Railroad Defendants' fuel efficiency is "constantly improving."  BNSF, for example, disclosed in 2005 that it had achieved a 9% improvement in fuel efficiency over the prior ten years.  In 2006, the railroads could, on average, move one ton of freight 423 miles on one gallon of diesel fuel.  By calculating fuel surcharges as a percentage of the shipping rate, the Railroads deflected attention from the cost savings they achieved through fuel efficiency

gains.  Additionally, all gains from fuel efficiency were kept as profit.  In a competitive market, Defendants would have used such cost advantages to compete on price.

87.    Similarly, Defendants previously reduced the prices they paid for diesel fuel by engaging in large-scale price hedging activities.  Railroads are in a unique position of being able to perform large scale physical hedging because of the substantial amounts of fuel they use. However, Defendants have reduced or eliminated their fuel hedging programs as their Rail Fuel Surcharge programs became ever more successful at generating revenue.  In a competitive market, Railroads would not have foregone seeking cost advantages through active fuel hedging programs.

88.    Another aspect of Defendants' conspiracy is that the Railroad Defendants maintained low initial trigger points for their fuel surcharge programs, which were well below the cost of fuel they were incorporating into their rates.  For example, UP maintained during the Class Period an initial trigger point of $1.35 per gallon – meaning that fuel surcharges would be instituted when the HDF index exceeded $1.35 per gallon.  The HDF has not been below $1.35 per gallon since September, 2002.  However, UP never rebased its minimum threshold for triggering application of a fuel surcharge, even as it raised rates to shippers that reflected, in part, increases in fuel costs.  The other Railroad Defendants similarly maintained low trigger points.

**The STB Ruled That Defendants' Surcharges Constitute an "Unreasonable Practice" as Applied to Regulated Freight Shipments**

89.    In January of 2007, the STB served an administrative decision concluding that the Railroads' practice of computing Rail Fuel Surcharges as a percentage of base rates for regulated rail freight transport was "a misleading and ultimately unreasonable practice" because the fuel surcharges are not tied to the fuel consumption associated with the individual movements to

which they are applied.  *Rail Fuel Surcharges*, Surface Transportation Board, Decision, STB Ex

Parte No. 661 (Jan. 25, 2007).  The STB directed railroads to stop this unreasonable practice.  *Id.*

90.     Although the STB's decision applied only to regulated freight, the Railroad

Defendants followed the same unreasonable practices with regard to the unregulated freight that

is the subject of this complaint.

### Defendants Published Their Fuel Surcharges on their Websites to Facilitate Coordination and Implementation of the Conspiracy

91.     Throughout the Class Period, the Railroad Defendants published their fuel

surcharges on their websites to facilitate collusion and to police the conspiracy.

92.     The Railroad Defendants did this even though they were aware that concerns were

raised by members of the Congress of the United States and the Antitrust Division of the

Department of Justice about the public disclosure of pricing information by railroads.

93.     In July of 2004, Representative F. James Sensenbrenner, Jr., Chairman of the

House of Representatives' Committee on the Judiciary, wrote a letter to the Antitrust Division of

the Department of Justice raising several potential concerns with railroad industry activities.

Among these concerns was that the "major western Class I railroads" (*i.e.*, BNSF and UP) were

attempting to disclose prospective shipping rates publicly in non-confidential pricing circulars.

94.     On September 27, 2004, the Antitrust Division responded, stating:

> Under the antitrust laws, the public disclosure of pricing information among
> competitors can, under some circumstances, facilitate collusion and result in
> increased prices, in violation of section 1 of the Sherman Act. *See, e.g., United
> States v. Airline Tariff Publishing Co.*, 1994 Trade Cas. (CCH) ¶ 70,687 (D.D.C.
> 1994).  **Publicly announcing prospective rates outside the confines of a rate
> approval proceeding at the Surface Transportation Board is likely to be
> subject to review under the antitrust laws.**  If you know of anyone who has
> information that you believe might be useful for evaluating this practice under the
> antitrust laws, please encourage them to contact the Antitrust Division.
> (Emphasis added.)

95.    In February of 2005, the Antitrust Division began a probe of UP and BNSF's pricing practices for coal shipments from the southern Powder River Basin in Wyoming and Montana.

**Specific Concerns Were Raised About Defendants' Fuel Surcharge Practices**

96.    On October 19, 2005, Senator Tim Johnson wrote to the Federal Trade Commission ("FTC") expressing concern about the "skyrocketing costs of rail transportation during th[e] fall season," and specifically urging the FTC to investigate the fuel surcharges being imposed by Defendants on the shipment of commodities.  As Senator Johnson observed, "We've seen a steady increase in the fuel surcharge for the shipment of commodities this fall, and while the high price of fuel may excuse some additional expenses for transportation this fall, producers are concerned that this surcharge may in fact be excessive."

97.    Even in the face of such concern, and the growing outcry from customers, no Defendant made any significant effort to modify its fuel surcharge program on unregulated freight to attract customers and gain market share during the Class Period, and the Defendants only made changes to their regulated traffic after being forced to do so by the STB.  This disregard of normal competitive behavior strongly indicates the operation of anticompetitive conduct.

**ANTITRUST "PLUS FACTORS"**

98.    Additional antitrust "plus factors" further support the allegation that Defendants agreed to fix prices for Rail Fuel Surcharges.

99.    <u>The railroad industry is highly concentrated</u>.  The Railroad Defendants in this case are the five largest remaining domestic Class I railroads following decades of mergers and

consolidation.  The Railroad Defendants account for more than 90 percent of the nation's rail freight traffic.  Such high concentration facilitates the possibility of a price-fixing cartel.

100.   <u>There are significant barriers to entry into the railroad industry</u>.  To compete, railroads must invest in a vast network of tracks, stations, yards, and switching facilities.  Such infrastructure takes decades to develop and requires onerous regulatory and environmental reviews and approval.  Land or easements are often needed, necessitating the involvement of multiple local governments and the exercise of eminent domain power.  Because rail infrastructure is of minimal value for other purposes, and rail networks are difficult to assemble, the fixed costs are largely sunk, creating significant entry barriers.  Entry also requires that a new entrant capture a significant market share from existing carriers.  Entry is thus both expensive and risky.

101.   <u>The Rail Fuel Surcharges were highly standardized</u>.  The Railroad Defendants structured their Rail Fuel Surcharges as a percentage of base rates and then published the percentages on their websites so the colluding railroads could police the conspiracy without frequent communications.

102.   <u>The railroad industry has a history of price fixing and other anti-competitive behavior</u>.  In the first antitrust case dealing with the railroad industry, *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897), the railroad cartel argued that it must fix prices or the industry would go bankrupt.  Prior to deregulation, railroads engaged in open price fixing through establishment of "rate bureaus" and "rate-making committees."

103.   <u>The CEOs of the Railroad Defendants are all board members of the AAR</u>, which facilitates transfer of pricing information.  The AAR describes itself as "the central coordinating

and research agency of the North American rail industry." The AAR Board meets regularly and board members (and their staff) regularly communicate between meetings.

104.    <u>Defendants acted in contravention of their individual economic interests</u>. The Railroad Defendants did not behave as if they were in a competitive market:

i)    <u>Defendants failed to compete on the Surcharges</u>. In a competitive market, railroads levying surcharges based on a percentage of a customer's freight rate – bearing no relation to the actual costs of fuel consumed and therefore not actually crucial to cost recovery – would compete on the basis of surcharges in order to lower a customer's overall bill and thereby gain business. Shippers from many different industries, some with significant economic power, tried to negotiate the fuel surcharge percentages, but were told by the Railroad Defendants that the Rail Fuel Surcharges were not negotiable. Several national shipper organizations met with each of the Railroad Defendants to encourage them to reexamine the methods used to assess Rail Fuel Surcharges. Among the Defendants, only BNSF agreed to make responsive changes to its surcharge program, and that was only for grain and coal shipments coming from certain regions where BNSF is the only carrier. Aside from this, the Railroad Defendants refused to address the concerns of their customers.

ii)    <u>Defendants' behavior alienated customers</u>. At or about the time Railroad Defendants agreed to fix the Rail Fuel Surcharge prices, they largely switched from offering long-term contracts to offering contracts that were "re-priced" in new negotiations semi-annually, quarterly, or monthly. Previously, the Railroad Defendants had allowed, and often preferred, long term contracts ranging up to five years with clauses that did not permit rate increases beyond a certain point or that excluded fuel

surcharges altogether.  The Railroad Defendants made this switch even though most shippers preferred the former system in order to minimize risk.  In a competitive environment, forcing customers to assume greater risks without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which should promote competition between carriers for their business.  Here, all Railroad Defendants raised prices and did not offer any compensation to customers for assuming additional risk.  This behavior gives rise to an inference of price fixing.

        iii)    <u>Defendants changed billing practices to expose each other's prices</u>.  The Railroad Defendants sometimes stopped offering "through rates," in which a shipper would receive a single bill from either the originating shipper or the termination railroad and a single fee would be allocated among the railroads that shipped.  Instead, the Railroad Defendants moved to what is known in the industry as "Rule 11 pricing."  Under Rule 11 pricing, where a shipment requires movement on more than one carrier, the two rates are stated separately rather than as one quote for the entire shipment.  The Railroad Defendants made this change as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple line shipments and to allow each railroad to apply the agreed-upon Rail Fuel Surcharge in its own territory.

        105.    <u>During the Class Period, rail freight demand grew, but each Defendant's market share remained stable</u>.  Demand for rail freight transportation services grew substantially during the period of the conspiracy, and yet the Railroad Defendants' market shares remained relatively stable and constant.  The fact that market shares did not did not fluctuate significantly during a

period of demand growth is further indication that the Railroad Defendants agreed to price fix rather than to compete for new sales.

**INTERSTATE TRADE AND COMMERCE**

106.    During the Class Period, the Railroad Defendants transported more than 90 percent of all rail freight shipments within the United States.  According to the STB, railway operating revenues for all Class I freight railroads was more than $52 billion in 2006.

107.    The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce.  During the Class Period, Defendants and their co-conspirators sold and carried out rail shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States.  Each Defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market rail freight transportation services.

108.    The unlawful activities of Defendants and the unnamed co-conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

**ANTITRUST INJURY TO PLAINTIFF AND THE CLASS**

109.    The unlawful conduct, combination or conspiracy alleged herein had and is having the following effects, among others:

a.    The prices paid by Plaintiff and the Class for unregulated rail freight transportation services were fixed or stabilized at supracompetitive levels;

b.    The Rail Fuel Surcharges charged to Plaintiff and the Class for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels;

c.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation; and

      d.    Competition in establishing the prices paid in the United States for unregulated rail freight transportation has been unlawfully restrained, suppressed, and eliminated.

110.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the members of the Class have sustained injury to their business or property. The injury sustained by Plaintiff and the Class is the payment of supracompetitive prices for Rail Fuel Surcharges and unregulated rail freight transportation as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal laws were meant to punish and prevent.

## COUNT I

### (Violation of § 1 of the Sherman Act and § 4 of the Clayton Act)

111.    Plaintiff incorporates by reference the allegations in the above paragraphs as if they were fully set forth herein.

112.    Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

113.    The contract, combination, or conspiracy resulted in an agreement, understanding or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for Rail Fuel Surcharges for rail freight transportation handled through private contracts and other means exempt from regulation. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

_

114.    Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between and among Defendants.

115.    The contract, combination or conspiracy has had the following effects:

a.    Prices charged to Plaintiff and the Class for unregulated rail freight transportation services were fixed and/or maintained at supracompetitive levels;

b.    Prices charged to Plaintiff and the Class for Rail Fuel Surcharges applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

c.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

d.    Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

116.    As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Rail Fuel Surcharges and unregulated rail freight transportation services during the Class Period.

WHEREFORE, Plaintiff prays for relief as follows:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be denominated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C.    That Plaintiff and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and each and every member of the Class;

D.    That each of the Defendants' respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly or indirectly, continuing or maintaining the combination, conspiracy, or agreement alleged in this case;

E.    That Plaintiff and the Class recover treble damages, as provided by law;

F.    That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

G.    For such further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  September 25, 2007

     /s/  Benjamin D. Brown
Michael D. Hausfeld (D.C. Bar #153742)
Benjamin D. Brown (D.C. Bar #495836)
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile:  (202) 408-4699
Email:  mhausfeld@cmht.com
       bbrown@cmht.com

Steven A. Kanner
Douglas A. Millen
Robert J. Wozniak, Jr. (D.D.C. Bar #475609)
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130

Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile:  (224) 632-4521
Email: skanner@fklmlaw.com,
          dmillen@fklmlaw.com,
          rwozniak@fklmlaw.com

Mark S. Goldman
**GOLDMAN, SCARLATO & KARON, P.C.**
101 West Elm Street, Suite 360
Conshohocken, PA 19428
Telephone: (484) 342-0700
Facsimile:  (484) 342-0701
Email: goldman@gsk-law.com

Andrew B. Sacks
**SACKS & WESTON**
114 Old York Road
Jenkintown, PA 19046
Telephone:  (215) 925-8200
Facsimile: (215) 925-0508
Email: ABS@sackslaw.com

James Shedden
Lawrence W. Schad
**SCHAD, DIAMOND & SHEDDEN, P.C.**
332 S. Michigan Avenue, Suite 1000
Chicago, IL 60604-4398
Telephone: (312) 939-6280
Facsimile:  (312) 939-4661
Email: jshedden@lawsds.com
          lschad@lawsds.com


***Attorneys for Plaintiff McIntyre Group, Ltd.  and
the Proposed Class***